[Crim. No. 409. In Bank.—March 25, 1898.]

In re GEORGE MITCHELL on Habeas Corpus.

POLICE COURT OF LOS ANGELES.—The police court of the City of Los Angeles was lawfully organized under the act of March 18, 1885, known as the Whitney act, providing for police courts in cities having thirty thousand and under one hundred thousand inhabitants; and the act of February, 1897, authorizing any city or city and county of the state to take its census, under which Los Angeles was then found to have more than one hundred thousand inhabitants, did not work an implied repeal of the act under which the police court was organized; nor did the increase of population operate to discontinue the court which was lawfully organized under that act, in the absence of further legislative action to that end.

WRIT of *habeas corpus* from the Supreme Court to the chief of police of the City of Los Angeles.

The facts are stated in the opinion of the court.

Jones & Weller, for Petitioner.

McFARLAND, J.—The petitioner, George Mitchell, was on the twenty-sixth day of February, 1898, convicted of a misdemeanor by the police court of the city of Los Angeles, and judgment was therein rendered that he pay a fine of thirty dollars, or to be confined in the city jail one day for each one dollar of the fine. Under this judgment he is held in custody by John M. Glass, chief of police of said city. The prosecution under which petitioner was convicted was commenced on February 17, 1898, and the offense of which he was found guilty is alleged to have been commited on February 16, 1898, and the sole ground upon which petitioner seeks to be discharged is that the said police court was not on either of said dates a legally existing court.

The police court of the city of Los Angeles was organized under an act of the legislature approved March 18, 1885, entitled, "An act to provide for police courts in cities having thirty thousand and under one hundred thousand inhabitants, and to provide for officers therof," generally known as the "Whitney act." (Stats. 1885, p. 213.) This act provides specifically, and in detail, for the organization, jurisdiction, powers, and duties of the courts to be established under it, and the court in question here

was organized and has been continuously performing its duties under said act for many years. If it must be held that it has now no legal existence, great embarrassment and defect in the administration of public justice will follow.

It is not necessary to notice any of the general objections to the legality of the said police court, founded upon considerations of questions arising prior to a certain city census, to be hereafter noticed, taken in the year 1897. Its general validity as a legally constituted and existing court has been firmly established by former decisions. (See *People v. Henshaw*, 76 Cal. 436; *Ex parte Ah You*, 82 Cal. 339; *Pasadena v. Stimson*, 91 Cal. 238.) The contention that the court was abolished by the taking of said census is the only one which we need consider.

An act of the legislature was passed in February, 1897 (Stats. 1897, p. 28), entitled, "An act to authorize any city or city and county of this state to take its census." The act is composed of three sections. By section 1 the council or other legislative body of a city or city and county is authorized to take a census of the city or city and county in the manner prescribed by section 2; and section 2 provides that the legislative body shall pass a resolution of intention to take the census and appoint one or more suitable persons to take it, who shall make an alphabetical list of all the inhabitants and file it, duly verified, with the clerk of the city or city and county. Section 3 provides that the clerk shall file a certified copy of the census thus taken with the secretary of state, and that thereupon it shall be the official "state census" of said city or city and county. After the passage of said act, and in the year 1897, and before the commission of the offense of which petitioner was convicted, the city of Los Angeles had a census taken and certified to the secretary of state in accordance with said act; by such census it appeared that the city had then more than one hundred thousand inhabitants; and the contention of petitioner is, that by virtue of said act, and the other facts above stated, the said police court was abolished and went out of existence at the date of the filing of the certificate of census with the secretary of state, because it appeared by such census that the city had then more than one hundred thousand inhabitants, and was, therefore, no longer within the Whitney act.

CXX. CAL.—25

It is not contended, and could not be successfully contended, that the act of February, 1897, expressly or directly repeals the Whitney act, or that there can be gleaned either from its title or text any intent to abolish the police court of Los Angeles. The Whitney act deals with and creates a part of the judiciary under power expressly given by the constitution; while the act of February, 1897, has no reference whatever to the judiciary, and gives no evidence that at the time of its passage the legislature had any thought of the judicial system, or any intent to disturb or interfere with the existence or functions of any court. It makes no provision for any other court to take the place of the one now claimed to have been abolished. But the contention is, substantially, that the act authorized certain subsequent occurrences which incidentally, and inferentially, and in a roundabout way—somewhat after the manner described in the story of the "House that Jack Built"—unintentionally and necessarily worked the abolition of the police court. Such a conclusion should not be adopted unless the written law imperatively demands it.

It is argued that a court should resolutely shut its eyes to consequences, and give no heed to the ruinous results of a statute. But that is so only where such results follow necessarily from clear and explicit language in the statute; where it is fairly susceptible of two constructions, one leading inevitably to mischief or absurdity, and the other consistent with justice, sound sense, and wise policy, the former should be rejected and the latter adopted. This principle is as old as American and English jurisprudence, is stated in text-books on the subject, and has been declared by this court. (*Burnham v. Hays*, 3 Cal. 119; 58 Am. Dec. 389; *People v. Turner*, 39 Cal. 379; *Cullerton v. Mead*, 22 Cal. 98, 99; *Jacobs v. Supervisors*, 100 Cal. 127; Sedgwick on Statutory and Constitutional Law, 312; Endlich on Interpretation of Statutes, secs. 258, 264-66.) Where the language of a statute is clear, and leaves no doubt as to the legislative intent, there is no room for interpretation, and judicial discretion cannot break its force, however disastrous the consequences may be; but the rule, as stated by Sedgwick, is that: "Where the judge has an admitted and necessary discretion, considerations of policy and wisdom, hardship, and inconvenience become as indis-

pensable as they are out of place when the matter has been definitely decided by the legislature." (Sedgwick on Statutory and Constitutional Law, 312.)

Does that act of February, 1897, and the said city census clearly and necessarily abolish the police court? We think not.

Although the peculiarities of this case involve not only the act in question, but also certain proceedings taken by the city under it, still the principles governing the subject of the repeal of statutes are applicable to it. It should not be held that the legislature intended, by the said act, to repeal or abrogate the Whitney act so far as it embraced the city of Los Angeles, and to abolish a court of long standing which was a part of the judiciary system and necessary to the administration of justice, or to allow the city to do so—if, indeed, power could be given the city to destroy what it could not have created—unless such holding be forced by the imperative language of the act.

There is no repealing clause in the act, and no reference whatever to the Whitney act; and repeal by implication is not favored. A later act, containing no repealing clause, does not repeal a prior act except so far as the two are clearly inconsistent, or unless it is manifest that the later act was intended as a substitute for the former in all respects, and to cover the entire subject matter to which both relate. . These principles are elementary, and they apply here as forcibly as if the direct question was as to the repeal of a statute. (See cases cited in 3 Deering's California Digest, 2661.)

This subject is exhaustively discussed in the opinion of the court, and the briefs of counsel, in *Bruce v. Schuyler*, 4 Gilm. 221, 46 Am. Dec. 447, where the court say that "the provisions of any statute ought to receive such an interpretation, if the words and subject matter will admit of it, as that existing rights of the public or of individuals be not impaired."

In *Bowen v. Lease*, 5 Hill, 221, which was approved by this court in *Perry v. Ames*, 26 Cal. 382, and *People v. Platt*, 67 Cal. 21, the court say: "The inevitable rule of construction in respect to the repealing of statutes by implication is that the earlier act remains in force, unless the two are manifestly inconsistent with and repugnant to each other, or unless some express notice is taken of the former, plainly indicating an intention to abrogate

it." In that case the two statutes under review were upon the same subject, while in the case at bar they were upon different subjects—thus making the rule there stated still more strongly applicable here; and upon that subject this court, in *People v. Platt, supra,* quoting from *Rawson v. Rawson,* 52 Ill. 62, say: "The acts are not upon the same subject, and if the rule be, as it undoubtedly is, that a subsequent act upon the same subject will not be held to repeal a former act by implication, unless the new act contains provisions contrary to or irreconcilable with those of the former act, with much more force and propriety may it be argued that a subsequent act not on the same subject shall not be construed to repeal a former act by implication." In *Crosby v. Patch,* 18 Cal. 443, this court, after stating the general rule, say, quoting from Sedgwick: "The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as tending to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction in order that its words shall have any meaning at all." (See, also, *Iverson v. State,* 52 Ala. 172; *United States v. Claflin,* 97 U. S. 546; *Fowler v. Pirkins,* 77 Ill. 274; Endlich on Interpretation of Statutes, sec. 223.)

In the light of the foregoing principles and authorities, we do not see that the act in question, and the census taken under it, necessarily resulted in the abolition of the police court, and the act should not be "so construed as to work a public mischief unless required by words of the most explicit and unequivocal import." (*People v. Lambier,* 5 Denio, 15; 47 Am. Dec. 273.) The act should not be so construed unless such construction be necessary "in order that its words shall have any meaning at all." (*Crosby v. Patch, supra.*) Meaning can be given to all the words of the act without reaching the conclusion that it contemplates a termination of the applicability of the Whitney act to the police court of Los Angeles, and the utter destruction of that court. The act merely provides in general terms that any city may take a census, and makes no reference to courts, while

the Whitney act deals specifically with the subject of police courts; and in this respect they come within the principles of construction which govern in cases of apparent conflict between general and special laws—the latter being held to prevail where such holding is permissible. The act permits a city to take a census; but it does not declare what legal effect the census shall have, what it shall be evidence of, what purpose it shall subserve, or how it shall affect other specific laws long standing on the statute book. It says, it is true, that the census shall be the official "state census of said city," but that declaration has little, if any, significance, because there is no such thing—at least our attention has not been called to such a thing—as a "state census" and it is difficult to understand how a city census can be part of a state census which never had an existence. Under these circumstances, and in the light of the principles heretofore stated, the act should not be construed as intending to establish evidence which shall directly affect the Whitney act, and shall, with reference to that act, *ipso facto* work a legal change in the population of cities so as to instantly destroy all courts created under it. Other and more special legislation would certainly be necessary to accomplish such grave and harmful consequences. There are other apparent purposes for which the act may have been passed; and meaning can, therefore, be given to all its language without adopting the wide construction contended for by petitioner. For instance, it was stated at the argument that the actual intent of the act in question was to put the city in a higher class as to population for the purpose of increased postal facilities under the United States postoffice department, and also for the convenience and benefit of certain attachés of that department; and, although that statement is outside the record, yet it suggests one of the purposes for which the act may have been intended. We know, as a matter of law, that United States postal facilities are dependent to a great extent upon population. Moreover, the general act for the classification of cities according to population, passed March 2, 1883 (Stats. 1883, p. 24), provides that the United States census taken in 1880, and every ten years thereafter. "shall be the basis upon which the respective populations of said municipal corporations shall be determined, unless a direct enumeration of the inhabitants thereof be

made, as in this act provided, in which case such direct enumeration shall constitute such basis"—the enumeration provided for in that act requiring a vote of the people, and being entirely different from the census involved in the case at bar. It will be noticed that the classification act expressly declares that the United States census shall be "the basis" for the determination of the population of cities, except when there shall be the other enumeration provided for in that act, and that then the latter shall "constitute such basis"; but in the act of 1897, here in question, there is no such declaration, nor is there any allusion whatever to the act of 1883, which fixes a permanent basis of enumeration for purposes of classification; and these facts give further assurance that the purpose of the act here in question was not to change, and that it does not change, the basis of enumeration theretofore applicable to the Whitney act and the courts organized under it.

Our conclusion is, that the police court of Los Angeles is, and at the times of the occurrences mentioned in the petition was, a legally existing court.

There was brought into the discussion, incidentally, a question as to the existence of the offices of the justices of the peace in the city of Los Angeles, but it has been declared that justices of the peace are part of the constitutional judiciary of the state, and the determination by the legislature of their number in an incorporated city is not subject to the distinction between general and special laws. (*Bishop v. Oakland*, 58 Cal. 572; *People v. Ransom*, 58 Cal. 558; *Jenks v. Oakland*, 58 Cal. 576; *Coggins v. Sacramento,* 59 Cal. 599; *Kahn v. Sutro*, 114 Cal. 316.)

The prayer of the petitioner is denied, and he is remanded to the custody of the chief of police.

Van Fleet, J., and Garoutte, J., concurred.

Harrison, J., and Temple, J., dissented.

HENSHAW, J., concurring.—I concur in the judgment. I do not, however, understand that it is contended that the Whitney act is repealed, either directly or impliedly, by the census act of 1897, but rather (as I follow petitioner's argument) that the Whitney act by express language applies only to cities of a

specified population; that if a city once possessing that population shall outgrow the maximum limit fixed by the act, then *ipso facto* it has outgrown the act which is not thereby repealed, but merely ceases to apply to that particular municipality. The question of population thus becomes a fact to be judicially ascertained, and when so ascertained is the determinative factor in the problem. The act of 1897 declares that the census when taken shall be the official state census of the city, and this at least means that it affords evidence of controlling weight in determining the question of population.

Such I understand to be petitioner's argument. The facts are unquestioned. The Whitney act declares that a police court is created in cities "having thirty thousand and under one hundred thousand inhabitants." Los Angeles was such a city. By census taken under the act of 1897 it is found to have a population in excess of one hundred thousand; hence, the police court of the Whitney act in which petitioner was convicted no longer exists, because the act has ceased to apply to that municipality.

If it is conceded that a city which originally came under the operation of such a statute passes without the purview of the act merely by an increase or decrease of population, then to my mind the argument of petitioner becomes unanswerable, and the conclusion he reaches irresistible. I think, however, that such is not a necessary nor yet the proper construction. The true construction I believe to be this: Such laws are directed to classes of cities, and are valid only when directed to classes. They apply to cities belonging to the class at the time when the law first became operative. A city thus originally belonging to a class does not cease so to belong merely by a change in population. There must also be legislative action, either mediate or immediate, directed to that end.

The constitution requires that legislation for specified purposes shall be directed to cities and to counties by classes, and that population shall be the basis of the classification. In counties, the compensation of officers can be fixed only under a classification based upon population, while in cities all legislation affecting incorporation, organization, and classification must also be based upon a like system. (Const., art. XI, secs. 5, 6; *Rauer v. Williams*, 118 Cal. 401.)

The legislature might have obeyed this constitutional mandate by declaring that certain counties, naming them, constituted the first class, others named the second class, and so throughout. The same might have been done with cities. The result would have been to put all counties and all cities by name in designated classes, and, if the classes were based upon population, and differences in population appeared to justify the classification—in other words, if it was shown to be a designation and segregation resting in reason and not in arbitrary whim, it would unquestionably have been upheld by the courts. Such a mode would have relieved from many vexatious questions which now confront us. Instead, however, the legislature saw fit to make a rule of classification, rather than a classification itself, by designating the number of inhabitants which should fix the class. The number of inhabitants was thus in every case left for ascertainment before the class to which the county or the city belonged could be determined. In the case of counties, this form of legislation has been carried to the uttermost limit, so that we now have the fifty-seven counties of this state divided into fifty-seven so-called classes. Each county is made a class. It is only the extreme of compulsion which would force recognition of such laws as creating a classification by population within the meaning of the constitution.

In cities under the statute of 1883 a more rational classification was adopted. (Stats. 1883, p. 24.)

But in both instances it is the population at the time when the law first became operative that fixes the class, and the class being so fixed is not affected by future fluctuations and changes in population, without further legislative action. This I take to be the true meaning of the constitutional injunction upon the legislature to classify cities and counties by population. Were it not so, untold confusion would result. There would be times when counties would be greatly embarrassed, and many cities would be without charters or any form of municipal government.

Let it be assumed, to illustrate, that a county originally of the twenty-fifth class by increase of population ranks as a county of the twentieth class. If an increase in the number of inhabitants of itself works the change in the class the county would *ipso facto* become a county of the twentieth class. But what

would result? Some of the county officers may be feed in the one class and salaried in the other. The very purpose of the law is to increase compensation in the higher class for a supposed increase of labor based upon a larger population. But there is a constitutional provision forbidding an increase in the salary of public officers during the terms for which they are elected. The county officers could not draw the salaries of officers of a county of the twenty-fifth class, because their county no longer belonged to that class. They could not· draw the salaries of officers of a county of the twentieth class, because it would be an increase in emolument. The solution would be found in instant resignations, and relief could come only from a special session of the legislature. In many cities the situation would be even more embarrassing. A number have adopted ·charters under the municipal corporation bill. (Stats. 1883, p. 93.) By this bill a city of a specified population may elect to adopt the charter therein provided for cities of its class. If the city has a population not exceeding three thousand it becomes a city of the sixth class. Assume that its population grows till it exceeds three thousand. The city then, if population alone is controlling, ceases to be a city of the sixth class and becomes a city of the fifth class. It has then outgrown its charter; but, upon the other hand, it has acquired no new one, since this under the law it can only do by a vote of its people. It would then be left without any organic law whatsoever. This consideration was manifestly in the legislative mind, for it is provided by the classification act that, having adopted a charter of the class to which it belongs, the city retains that charter, notwithstanding any increase in population, until its people by vote shall adopt that of another class.

This provision would, of course, be invalid, if the construction for which petitioner contends is to obtain, for, if the constitution designed that changes in population should control the class at any and all times, then a legislative declaration to the contrary would be without effect. The statute, however, is interesting and instructive, as showing that a co-ordinate and independent power in the government must in passing the act have construed the constitution as is here done. It is a legislative expression that the class is fixed by the population as it stood at

the time when the law became operative, and that it is not afterward affected by a mere change in population.

The same rule and reason, I think, apply to the case under consideration. Laws such as the Whitney act, creating municipal courts, it is to be remembered, are laws pertaining with peculiar force to the organization of cities. Laws affecting organization of cities are required to be general and to apply to all cities, or to all cities of the class specified in the classification act. (Stats. 1883, p. 24; *Pasadena v. Stimson*, 91 Cal. 238; *Darcy v. Mayor*, 104 Cal. 642; *Rauer v. Williams*, 118 Cal. 401.) The Whitney act was upheld as being such a general law, substantially conforming to the classification act of 1883, and applying to one of the class of cities created thereunder. Such is the necessary effect of the decision upholding the Whitney act in *People v. Henshaw*, 76 Cal. 436, where it is said, at page 446: "To so classify them [cities] that general laws applicable to these separate classes will meet the necessities of the case was a wise provision, and a law which applies to one or more, but not to all, of these classes is not for that reason special legislation." In *Pasadena v. Stimson, supra,* reviewing the decision in *People v. Henshaw, supra,* it is said: "The author of the prevailing opinion assumed that the class of cities to which the Whitney act was made applicable was identical with the second class as defined in the general incorporation act. . . . . It must be borne in mind that the subject of the Whitney act (a police court) was peculiarly a matter pertaining to municipal organizations." Were not this the true construction of the Whitney act and of the opinion of this court upholding it, the law would have been overthrown as special legislation, for, as is said by this court in *Darcy v. Mayor, supra:* "Section 6, article XI, was evidently intended to limit, and not to enlarge, the power of the legislature, and I think it was intended that the classification there authorized was to be by a general law in the same sense and in the same way in which it was necessary to provide for the incorporation and organization of cities and towns, and legislation in regard to such corporations would thereafter be made by reference to the classes thus made. The special authority to thus classify cities and towns would also seem to imply that they cannot be otherwise classified for purposes of legislation. If they can be, and new

classes created whenever it is desired by anyone to procure legislation which shall apply to only a few cities of the class, the limitations of the constitution, so carefully made and so oft repeated, can be easily defeated."

It is, therefore, apparent that the Whitney act is a general statute dealing with cities of the second class. Now, such a statute affecting the organization of a class of cities, in fact and effect, though not in terms, becomes a part of their organic law, a part of the charter of such cities. It is beyond question that charters of cities are not affected by changes in population, and for the foregoing additional reason this law, which is essentially a part of the charter, likewise stands unaffected.