## Ex Parte FEDDERWITZ.

### Cr. No. 636; November 26, 1900.

#### 62 Pac. 935.

**Justices of Peace.**—Code of Civil Procedure, Section 103, as amended by Statutes of 1899, page 88, provides that in every city or town of the fourth class there shall be one justice of the peace. Statutes of 1883, page 24, as amended by Statutes of 1899, page 141, provides that all municipal corporations having a population of 10,000 and not exceeding 15,000 constitute the fourth class, and that there may be a special enumeration to determine the population of a city, which when made shall be deemed the number of inhabitants of such city for the purpose of legislation affecting municipalities. Statutes of 1895, page 409, in the preamble to a resolution ratifying the freeholders' charter of a town, recited that such town had a population of more than 10,000. Held, that the office of justice of the peace for such town had a legal existence, and could be legally filled.[1]

**Municipal Corporation—Freeholders' Charter.**—Where the Legislature, in the preamble to a resolution ratifying a freeholders' charter for a city, recited that such city contained a population of more than 10,000, such resolution, with the charter it establishes, being a law of the state, is conclusive as to the fact recited in the preamble.

**Justice of Peace—Attack upon in Habeas Corpus.**—Where the office of justice of the peace in a city has a legal existence, the title of the incumbent cannot be attacked in habeas corpus proceedings by a party convicted before such justice of violation of a municipal ordinance.[2]

---

[1] Cited in Williams v. Board of Trustees, 157 Cal. 719, 109 Pac. 486, in respect of the words of the chief justice: "A city of the fourth class, organized under the charter of that class, retains its charter notwithstanding an increase of population which put it in the third class."

Cited in Puterbaugh v. Wadham, 162 Cal. 617, 123 Pac. 807, a case involving the payment of salary to a justice of the peace.

Cited and followed in Puterbaugh v. Wadham, 162 Cal. 617, 123 Pac. 806, where the court held that, for the purpose of determining the amount of salary to be paid a justice of the peace of the city of San Diego, that city was to be regarded as having passed, without formal action of any sort, into the second class of municipalities under the code.

[2] Cited and followed in Ex parte Simmons (Nev.), 125 Pac. 698, where it was held that if the person presiding at the trial of the

Intoxicating Liquors.—A City Ordinance Providing That It shall be a misdemeanor for any person to sell or give away any spirituous liquors within the city, except a licensed druggist selling on the prescription of a regularly licensed physician, which does not conflict with any general law of the state, is valid, though it prohibits a single act of selling or giving away malt and spirituous liquors by one not engaged in the liquor traffic.

Intoxicating Liquors.—Where a City Ordinance Provides that it shall be a misdemeanor for any person to sell or give away any malt or spirituous liquors within the city except a licensed druggist selling on the prescription of a regularly licensed physician, a complaint charging a violation of such ordinance need not allege that defendant was not a licensed druggist, since that is a matter of defense.

Application for a writ of habeas corpus by George Fedderwitz against Oscar L. Rogers and another. Petition denied.

Chapman & Clift and A. L. Frick for petitioner; Brewton A. Hayne and Fox & Gray for respondents.

BEATTY, C. J.—The petitioner was convicted before Robert Edgar, claiming to be justice of the peace of the town of Berkeley, of violating an ordinance of that municipality. On appeal to the superior court the judgment of the justice's court was affirmed, and in pursuance thereof petitioner is held in custody of the sheriff of Alameda county. He claims that his imprisonment was unlawful: First, because there is no justice's court of the town of Berkeley; second, because the ordinance defining the offense of which he was convicted is void; and, third, because the complaint upon which he was prosecuted does not charge the offense defined in the ordinance.

It is assumed by counsel for petitioner that the question to be determined in this proceeding under his first point is

---

petitioners "was the justice de facto for the time being of," etc., "the judgment against petitioners was valid, and the authority of such de facto justice is not open to collateral attack upon a proceeding in habeas corpus."

Cited and followed in Re Bond, 12 Cal. App. 258, 107 Pac. 145, on the point that one sale may be a violation of a prohibitory liquor ordinance which says, among other things: "Any person, firm, corporation, club or association . . . . that sells, keeps for sale, offers for sale, furnishes, distributes, divides, delivers, or gives away any spirituous, vinous, malt or mixed liquors," etc.

in all respects the same as the question decided in Miner v. Justice's Court, 121 Cal. 264, 53 Pac. 795, and that it must be decided the same way, unless some legislation subsequent to the decision of that case can be found which leads to a different result. But in this assumption I think counsel are mistaken. The questions are not the same. In the former case the proceeding was by mandamus to compel the issuance of an execution upon a judgment rendered by the justice's court—consisting of two justices of the peace—which the legislature had attempted to create by the special and local act of March 27, 1895 (Stats. 1895, p. 205). It was claimed on the part of petitioner in that case that there was such a justice's court for the town of Berkeley created by that act, or, if not, that the court of similar title created by the original act of incorporation (Stats. 1877–78, p. 888) continued in existence notwithstanding the adoption of the freeholders' charter of March 25, 1895. Both points were ruled the other way, the court holding that the old court was abolished by the adoption of the freeholders' charter, and that the act attempting to create a new court was invalid because local and special; and, having thus disposed of the only questions presented by counsel for its consideration, the court denied the writ of mandate without considering the question presented by this case, viz., whether there is or can be a justice of the peace for the town of Berkeley. If, by legal possibility, there may be a justice of the peace lawfully exercising the powers of that office for the town of Berkeley, the right of Robert Edgar to act in that capacity cannot be drawn in question in this proceeding. If there can be a de jure officer, the right of the de facto officer cannot be collaterally assailed.

That the office of justice of the peace for the town of Berkeley has a legal existence is, I think, very clear. In the first place, it has been the law ever since 1880 that there shall be one justice of the peace in every city having 10,000 and not more than 20,000 inhabitants: Code Civ. Proc., sec. 103. This is part of a general law of the state (Code Civ. Proc., sec. 85 et seq.), the constitutionality of which has been frequently affirmed: Bishop v. City of Oakland, 58 Cal. 572; People v. Ransom, 58 Cal. 558; Coggins v. City of Sacramento, 59 Cal. 599. It will not be contended, I suppose, that Berkeley is not a "city," within the meaning of this act, because it has styled itself in its charter the "town" of

Berkeley; and, if it is a city, it became entitled to a justice
of the peace as soon as the fact was legally established that
it had over 10,000 inhabitants, and this fact was legally estab-
lished in the most solemn and conclusive manner by the pre-
amble to the joint resolution of the legislature of March 5,
1895 (Stats. 1895, p. 409), approving the freeholders' charter.
At the date of that resolution it was necessary that a city
should have a population of at least 3,500 before it could
frame a freeholders' charter (Const., art. 11, sec. 8, as
amended in 1892), and it was the undoubted right and duty
of the legislature to ascertain the population of Berkeley be-
fore acting upon the proposed charter.   This the legislature
did, and in the preamble to the resolution ratifying the char-
ter it recited and proclaimed the fact that the town of Berke-
ley contained a population of more than 10,000 inhabitants.
This resolution with the charter which it establishes is a law
of the state, and is conclusive as to the fact so recited in the
preamble.   If, therefore, the law assigning one justice of the
peace to every city with a population of more than 10,000
and not exceeding 20,000 had remained unchanged, I should
have no hesitation in holding, upon this ground alone, that
the office of justice of the peace for the town of Berkeley has
existed ever since the 27th of March, 1895; and, although
this conclusion might appear to be at variance with the con-
clusion reached in Miner v. Justice's Court, it is not incon-
sistent with anything actually considered or decided in that
case.   There the whole contention of counsel was in regard
to the validity of the special act of 1895 creating a court con-
sisting of two justices of the peace.   It was assumed through-
out the argument that, if the act of 1895 was invalid, there
was no justice's court in Berkeley, unless it could be held
that the provisions of the old charter of 1878, establishing a
justice's court, remained in force notwithstanding the free-
holders' charter of 1895.   The argument of counsel being
directed exclusively to these propositions, they alone were
considered in deciding the case.   If our attention had been
called to the provisions of section 85 et seq. of the Code of
Civil Procedure, and the population of the city as declared
in the resolution of the legislature approving the freeholders'
charter, we could not have held that the office of justice of
the peace of the town of Berkeley did not exist at that time.
And in fact we did not so hold.   All we decided was that

the court—consisting of two justices, of which alone Gentry claimed to be a member—had no legal existence. But since the decision of that case there has been new legislation, or attempted legislation, affecting the office of justice of the peace in cities and towns. On March 10, 1899, an act was passed to amend section 103 of the Code of Civil Procedure: Stats. 1899, p. 88. Before amendment it was provided in that section that in cities having a population of more than 20,000 and not exceeding 100,000 there should be two justices of the peace, and in cities having a population of more than 10,000 and not more than 20,000 there should be one justice of the peace. By the amendment this classification was discarded, and in place thereof it was provided that in every city or town of the third or fourth class there should be one justice of the peace, and in every city or town of the second class there should be two. Some question is made as to what is meant in this amendment by cities of the second, third and fourth classes, but to this question there can be but one answer. The only classes of cities known to our laws are those defined in the act of March 2, 1883 (Stats. 1883, p. 24), entitled "An act to provide for the classification of municipal corporations," by which all such corporations in the state were divided into six classes according to population, those having a population of more than 10,000 and not exceeding 15,000 constituting the fourth class. This undoubtedly is the classification to which the amended section refers. But, if this must be conceded, the petitioner contends that the object of this act was to classify cities and towns solely for the purpose of incorporation and organization under the general municipal incorporation act, which the new constitution enjoined, which was then under consideration, and which was subsequently passed at the same session of the legislature: Stats. 1883, p. 93. To this it may be answered that the title of the act does not indicate any such limited purpose, and the language of the first section is broad enough to embrace every purpose (including the assignment of justices of the peace) for which a classification by population might be expedient or permissible. In succeeding sections of the act, however, are contained provisions which indicate very plainly that the main, if not the only, purpose of that particular classification at that time was to establish a basis for the organization and reorganization of cities and towns under the

general incorporation act. That it was not intended to serve as a basis for the appointment of justices of the peace is further shown by the fact that a classification already established for that purpose (Code Civ. Proc., sec. 85 et seq.) was left undisturbed. But, conceding all this, the conclusion which the petitioner would draw from the original purpose of the act does not follow. His contention appears to be that section 103 of the Code of Civil Procedure is meaningless and void, because its provisions are based upon a classification originally adopted for the purposes of legislation upon another subject—a proposition to which we cannot accede. There is no reason why a classification of cities and towns by population originally adopted by one legislature for a particular purpose may not be referred to or made use of by a succeeding legislature for other purposes of legislation to which a similar classification is essential, and for which it will conveniently serve; and there would be neither reason nor excuse for holding the amended section 103 of the Code of Civil Procedure meaningless and void merely because it has made an act passed for one purpose serve another purpose equally legitimate. For it is to be remembered that there is here no question of the power of the legislature or validity of the law. It is a mere question of construction that we have to deal with, and, if there is a discoverable meaning in the statute, we have nothing to do but to declare and enforce it. That it has a meaning, and a very plain meaning, I cannot doubt.

But it is contended that, if this amendatory act refers to the classification of the act of 1883, it embraces only such cities and towns as have been incorporated under the general incorporation act; the proposition being that, unless a city or town has been so incorporated, it does not belong to any of the classes defined in the act of 1883, and especially if it has been incorporated under a freeholders' charter, as Berkeley has been, it does not belong in any class. So far as this argument depends for its support upon a construction of the amendatory act itself, it is refuted by the plain terms of the second section, which expressly provides that it shall not apply to cities incorporated under the general incorporation act; and, since they are made the only exception, the law must embrace all cities and towns with special charters. If, on the other hand, petitioner's contention depends upon the

proposition that the classification act of 1883 applies only to cities and towns organized under the general incorporation act, the argument is equally unsupported. When that act was passed, there was no general law in existence for the incorporation of cities and towns, and, as a necessary consequence, there were no such cities and towns to be classified. Considered by itself, and without reference to prospective legislation, if it classified any municipal corporations it must have classified those cities and towns theretofore organized under special charters antedating the new constitution. Considered with reference to contemplated legislation—that is to say, with reference to the bill then before the legislature, and subsequently passed, providing for the incorporation of cities and towns under the general law—it follows with equal certainty that the law embraced all existing corporations; for upon this view, and upon this view alone, can the two acts be harmonized. By the general incorporation act (Stats. 1883, p. 93) provision was made in the first three sections for the incorporation of the inhabitants of unincorporated territory of the respective counties, and then, by section 4, provision was made for the reincorporation under that act, and in their proper classes, of cities and counties, cities and towns, which had been previously incorporated under special charters. This would seem to prove conclusively, if any proof were needed outside of its title and its express terms, that the classification act of 1883 was intended to embrace all incorporated cities and towns then existing; and there is, to my apprehension, no reason for holding that it was not also intended to stand as a part of the permanent legislation of the state, and to have its legitimate operation, according to its terms, upon all cities and towns thereafter incorporated, whether under the general act then in preparation, or under freeholders' charters, as provided in the constitution. But, whether such was the original intention or not, there can be no doubt, in view of the second section of the act amending section 103 of the Code of Civil Procedure, that the legislature of 1899 understood that the act of 1883 embraced all cities having special charters, and that they intended its classification to serve in such cities, and in such cities alone, as the basis for the apportionment of justices of the peace. This view is, I think, sufficiently supported by the considerations above suggested, but it is made more evident by a significant

amendment to the classification act of 1883, contained in the act of March 20, 1899 (Stats. 1899, p. 141). It was provided in the original act that the decennial census of the United States should determine the population of the respective cities and towns, unless there should be a special enumeration of their inhabitants made under certain prescribed conditions. The legislature, recognizing that such special enumeration was originally authorized for the sole purpose of enabling a city or town to reorganize, if it so desired, under the charter of the higher or lower class to which it had risen or been reduced by gain or loss of population, and evidently anticipating the argument of the petitioner in this case, deliberately amended the act by inserting an express declaration that the special enumeration, when made, should serve the purposes of all legislation affecting municipalities. The original act, before amendment, provided fully and explicitly for the enumeration, and for the proceedings to be taken in order to effect a reorganization in a new class. Everything necessary for this purpose was fully and elaborately provided, and no amendment of the law was called for unless its scope was to be enlarged. This being so, the terms of the amendment seem peculiarly significant. It reads as follows: "Whenever the result of such enumeration sh. ' have been declared by the council, board of trustees, or other governing body, and entered in the minutes of such body, thereupon the number of such inhabitants so ascertained shall be deemed the number of inhabitants of such city for all the purposes of this act, and for the purposes of legislation affecting municipalities." To say that the amended act means nothing more than it meant originally is to violate fundamental principles of construction. Clearly, the amendment was intended to accomplish something, and that was to enable the inhabitants to secure to themselves the benefits of any general legislation applicable to cities and towns according to population without waiting ten years for the United States to take a census. If this were doubtful upon the terms of the statute, the doubt would be removed by the fact that the amendment was made by the same legislature, at the same time, and evidently as a part of the same scheme, as the amendment to section 103 of the Code of Civil Procedure. At the same time that they changed the law so as to apportion justices of the peace according to the general classification of the act of 1883, they

enlarged the scope of the enumeration provided for in that law so that it might serve to determine the proper number of justices in each city and town. From all of which considerations it clearly results that, if the town of Berkeley is a city of the fourth class, the office of the justice of the peace exists there by force of the amendment to section 103 of the Code of Civil Procedure, if that amendment is constitutional.

But it is still further contended that Berkeley is not a city of the fourth class in any sense attributable to the statute. I have already considered the objection that because it is organized under a freeholders' charter, or, rather, because it is not organized under the general incorporation act, it belongs to no class created by the act of 1883; and I think it has been demonstrated that even under the original act it falls into its proper class by virtue alone of the number of its inhabitants, and certainly that it is comprehended in the classification of the amended law.

The other objection under this head is that the mere ascertainment of the fact that Berkeley has risen to a population exceeding 10,000 does not put it into the fourth class. This contention is based upon section 3 of the classification act and the point supposed to have been decided in Re Mitchell, 120 Cal. 384, 52 Pac. 799. The whole contention, however, is based upon a confusion of terms, and is unaffected by anything decided or involved in Re Mitchell. The question discussed in that case in both the principal and concurring opinions was whether the police court of Los Angeles had ceased to exist the moment it was ascertained by a special enumeration that the population of the city exceeded 100,000, and all that was decided was that changes of municipal organization do not take place automatically in consequence of changes of population which remove cities from one class to another. This is quite in consonance with the provisions of the classification act. A city of the fourth class, organized under the charter of that class, retains its charter notwithstanding an increase of population which puts it in the third class. But it does not follow that because its charter remains unchanged its class remains unchanged. On the contrary, the privilege of changing its charter depends upon a change of class. The charter has nothing to do with fixing its class. That is dependent upon population alone, which is an element of all cities, however organized. In organizing under the

general law a city must accept the charter of its proper class; but, unless it elects otherwise, it retains its original charter, no matter to what class it may rise or fall by change of population. This is the whole effect of the decision in Re Mitchell, and it does not conflict with the proposition that Berkeley, like every other city of California, becomes at once, within the meaning of our statute law, a city of the class to which its legally ascertained population assigns it. As to the remark in Justice Henshaw's concurring opinion that legislation mediate or immediate is necessary to change the municipal organization, that view is satisfied by any formal, legal and appropriate action of the local authorities following upon an ascertained change of population. With respect to the election or appointment of a justice of the peace in a city whose population has come to exceed 10,000, an election duly called by the proper authority, or an appointment duly made, should be deemed sufficient. By such action no inconvenience could accrue, and great inconvenience might, in many cases, be avoided. As to Berkeley it has been pointed out that its population was ascertained and proclaimed by the legislature in 1895. This alone would determine its status as a city of the fourth class. But there has also been made a special enumeration of its inhabitants conforming to all the requirements of the amended act of 1899, above quoted, which also establishes the fact that it is a city of the fourth class for all purposes of legislation. Subsequent to this enumeration, Edgar was duly appointed to the office of justice of the peace.

Passing now from these questions of construction, which have been more fully considered, perhaps, than necessary, we come to the last contention of petitioner on this head, viz., that the act amending section 103 of the Code of Civil Procedure is unconstitutional, because it is a special law in a case where a general law could be made applicable. It is said, in the first place, that the law is special because it makes no provision for cities of the first class or for cities below the fourth class. But this objection overlooks the fact that provision is made for cities in the unamended sections of the same chapter of the code (sec. 85 et seq., Code Civ. Proc.), and that it has never been deemed an objection to the validity of that law that no provision was made for justices of the peace in cities and towns of less than 10,000 inhabitants. For

them the township justices are deemed sufficient. It is next said that the law is special, because cities organized under the general law are excluded from its operation. This is, to my mind, a much more serious objection to the validity of the law, and, speaking for myself, I should be inclined to hold that, unless the exception of that class of cities can be disregarded, the amendment is void. But this question does not require a decision in this case. Concede, for the present, that the amendment is void, and that the town of Berkeley is not entitled to a justice of the peace as a city of the fourth class, the simple result is that section 103 of the Code of Civil Procedure remains unamended, and Berkeley may claim a justice of the peace as a town of 10,000 inhabitants. The only real importance of this act in the present controversy consists in the light it sheds upon the meaning of the amended provision for the special enumeration of inhabitants of municipal corporations, and, whether constitutional or not, it shows the same intention on the part of the legislature.

Upon the foregoing considerations our conclusion is that in any possible view of the law the office of justice of the peace for the town of Berkeley has had a legal existence ever since the ratification of the freeholders' charter in 1895. The office existing, it could be legally filled, and the title of the incumbent cannot be assailed collaterally in this proceeding.

The next question to be considered is the validity of the ordinance under which the petitioner was convicted. The second section of the ordinance reads as follows: "From and after the first day of October, 1899, it shall be a misdemeanor for any person, either personally or by an agent or agents, or servant or servants, or employee or employees, or as agent, servant or employee, within the limits of the town of Berkeley to sell or keep for sale, or offer for sale, or give away, or permit, for any consideration, to be given away, directly or indirectly, any vinous, malt or spirituous liquors, or any mixture thereof, or any alcoholic or intoxicating liquors of any kind, or to establish, open, maintain or carry on, any tippling-house, dramshop, cellar, saloon, barroom, billiard-room or any other room or place where any such liquors are sold, or kept for sale, or are given away, directly or indirectly, within said town: provided, however, that the provisions of this ordinance shall not apply to the sale of liquors by any licensed druggist upon prescription of a physician regularly

licensed to practice medicine under the laws of the state of California, whose prescription and the sale thereunder, and the name of the person to whom the sale is made, shall be recorded by the druggist in the book to be kept for that purpose, which shall be open for the inspection of any citizen of Berkeley demanding an inspection thereof.'' A great many objections are urged against these stringent prohibitions, but it will be unnecessary to consider any except those which apply to the mere selling and giving away of intoxicating liquors by persons not regularly engaged in the traffic, such as keepers of barrooms, tippling-houses, etc. The charge upon which the petitioner was convicted was that of selling and giving away malt and spirituous liquors. It is not alleged that he kept a saloon, or that he was otherwise engaged in the traffic, either as a wholesale or retail dealer; and the question is whether the ordinance contains a valid prohibition against the act charged. If it does, it matters not that it may contain other prohibitions which the city has not the power to impose. The ordinance, in that case, would be merely void pro tanto, and its partial invalidity would not affect the judgment against this petitioner. It is claimed upon the authority of Merced Co. v. Helm, 102 Cal. 159, 36 Pac. 399, that a municipal corporation cannot make a single act of selling or giving away intoxicants a crime. But that case has no bearing upon the proposition. That was a civil action to recover a license which was imposed, and could only be imposed, for the privilege of conducting the business; and it was there held, among other things, that a single sale was not carrying on a business in the sense of the license laws. It does not follow from this, however, that a single sale may not constitute a crime if the ordinance so provides, as this clearly does. And the power to pass such an ordinance is granted in the most sweeping terms in section 11 of article 11 of the constitution. It can only be invalidated by pointing out some general law of the state with which it is in conflict, and there is no such law. Counsel concedes that it is well settled that the governing power of a municipality may prohibit the traffic in liquor altogether, so long as the prohibition does not interfere with interstate commerce (Ex parte Christensen, 85 Cal. 208, 24 Pac. 747; Ex parte Campbell, 74 Cal. 20, 5 Am. St. Rep. 418, 15 Pac. 318); but he seems to contend that there can be no such prohibition of single sales.

There is no ground, however, upon which this distinction can be maintained. The ordinance is valid if it does not conflict with some general law which makes an exception in favor of single sales. In Ex parte Campbell, supra, the court was careful to say that the case did not involve any question as to the right to sell liquor apart from the traffic, but it was not decided or intimated that a prohibition of single sales was beyond the power of the municipality. In this case—for the first time apparently—that question is directly involved, and we can only say that no law has been called to our attention with which the Berkeley ordinance conflicts.

Counsel claim that this ordinance, and similar ordinances in other cities, if enforced, would cripple a leading industry of the state, and that they are in conflict with the policy of certain laws of the state relating to viticulture. As to the general legislation of the state, it seems to manifest quite as much solicitude for the prevention of intemperance as for the encouragement of wine-making; but, since it is conceded that the traffic in intoxicating liquors may be prohibited by local ordinance, the wine-making industry would not be greatly benefited by upholding the right of individuals not engaged in the traffic to sell or give away an occasional bottle of wine. Another objection to the ordinance is that it prohibits the sale of liquors for chemical purposes. This may result in inconvenience, but we cannot see that it affects the validity of the ordinance. Still another objection to the ordinance is that it creates a favored class, viz., licensed druggists and physicians, who, by combining together, and complying with easy conditions, may carry on a traffic in intoxicating liquors to any extent; for, it is contended, the sale by druggists is not required to be for medicinal purposes, and, if a licensed druggist can only get a licensed physician to furnish the prescriptions, he may sell liquor to the sick and to the well alike. We do not think this argument needs a very serious treatment. Even a penal law would not be so construed as to sanction so manifest an evasion. The ordinance protects only sales in good faith upon regular prescriptions. We think the ordinance is valid so far as it relates to the charge against the petitioner. As to other matters the case calls for no expression of opinion.

In conclusion we will briefly notice the final contention of petitioner, viz., that the complaint does not sufficiently charge

the offense defined in the ordinance. The complaint simply charges that the petitioner sold, etc., without alleging that he was not a licensed druggist, etc. It is said that everything alleged might be true, yet the petitioner entirely innocent, and it is argued the complaint is, therefore, bad. But the rule of pleading, sustained by the weight of authority and of reason, does not support this conclusion. The best short statement of the law upon this point is contained in the opinion of Ellsworth, J., in State v. Miller, 24 Conn. 522, where he says: "The rule as everywhere laid down is that, after words of general prohibition, whatever comes in by way of proviso or exception need not be negatived by the pleader, but must be set up by the accused. In this view it is immaterial whether the proviso or exception be contained in the enacting clause of subsequent section, if it only follows a general prohibition." This statement of the law is sustained by the numerous cases cited in the brief of respondent in which the principle has been applied to laws and ordinances in all respects similar to the ordinance in question here. There are undoubtedly opposing authorities, but they are less numerous, and the decisions are, we think, less satisfactorily reasoned, than those which sustain the rule as laid down by Judge Ellsworth. In our own state there is one reported case in which this question was necessarily involved, and where, without discussion, the rule as above stated was assumed as the basis of the decision: Ex parte Bird, 19 Cal. 130. Where the exception is so connected with the prohibition as to be a part of the definition of the offense, there the rule of pleading is different, and according to all the authorities it must be negatived by the pleader. An instance of this sort is a statute making it penal to carry on a business without a license. In laying a charge under such a statute, where the want of license is the gist of the offense, the want of a license must be alleged: People v. Boo Doo Hong, 122 Cal. 606, 55 Pac. 402. Here, on the contrary, the offense consists in selling the liquor, and, if the person accused is one of those in whose favor an exception is made, he must allege and prove the fact as matter of defense. We think the complaint was sufficient, and the petitioner is remanded.

I concur: Van Dyke, J.

I concur in the judgment: Garoutte, J.

McFARLAND, J.—I concur in the judgment and in the opinion of the chief justice. I concur in all that part of the opinion which deals with the existence of the justice's court because I think it right; and I concur in all the rest of the opinion because I think that the validity of the ordinance in question, so far as it deals with the sale of wines, etc., has been finally determined by former decisions of this court, from which I dissented: See Ex parte Campbell, 74 Cal. 20, 5 Am. St. Rep. 418, 15 Pac. 318, and Ex parte Christensen, 85 Cal. 208, 24 Pac. 747. I desire to notice, however, that the charge against the petitioner was that he had unlawfully, etc., "sold and given away" certain named liquors. The offense charged, therefore, necessarily included a sale. But the ordinance, going further than the notion of business or traffic, provides that it shall be a misdemeanor for "any person" within the limits of the town of Berkeley "to give away" any "vinous, malt, or spirituous liquors." So that by the terms of this ordinance it would be a public offense punishable by imprisonment for any person in Berkeley, in his own home, and at his own table or fireside, to offer a glass of wine or beer to a guest; and I desire to say that when a petitioner convicted of this time-honored hospitality shall come here for relief I will not feel myself precluded from again inquiring whether or not a personal right guaranteed by the constitution has been violated.

TEMPLE, J., Dissenting.—Soon after this case was submitted, I prepared the annexed opinion, and a judgment discharging petitioner from custody. To that opinion I still adhere, notwithstanding the reasoning of the chief justice. I do not agree with the criticisms upon Miner v. Justice's Court of the Town of Berkeley. The counsel who appeared in that case, with one exception, appear also in this, and all points were then made in favor of the existence of the justice's court which are made here, so far as they then could have been made. The bearing which the new legislation would have upon the matter was, of course, not then considered. The questions discussed in the opinion were the only ones then thought material. The new proposition now made would, at the most, have been only an additional argument against the position then taken by the court. But, in my judgment, there is no force in the argument now made. The joint reso-

lution of the legislature approving the freeholders' charter is not evidence of the population of the town of Berkeley of the most solemn and conclusive character, or at all. No authority is cited in support of this proposition, and I venture the assertion that none exists. In Stevenson v. Colgan, 91 Cal. 649, 25 Am. St. Rep. 230, 14 L. R. A. 459, 27 Pac. 1089, the rule upon an analogous question was stated thus: "When the right to enact a law depends upon the existence of facts, it is the duty of the legislature before passing the bill, and of the governor before approving it, to become satisfied in some appropriate way that the facts exist; and no authority is conferred upon the courts to hear evidence and determine as a question of fact whether these co-ordinate departments of the government have properly discharged such duty." The legislative determination is conclusive upon the courts, so far as the validity of the law depends upon the existence of the facts; and accordingly it was held that in passing upon the validity of a law the court must confine itself to the facts apparent upon the face of the statute. Except as to what have been called "public facts"—such as the existence of a state of war, or martial law, or public disorder, or of certain political facts—the cases do not go further: Luther v. Borden, 7 How. (U. S.) 1, 12 L. Ed. 581. And I repeat the conclusiveness of the supposed legislative finding only obtains as to the question of the validity of the law. Here the question to be passed upon was not whether the town contained 10,000 inhabitants, but whether it contained 3,500. Only so far would it be binding upon parties if it were a judgment of a court. To that extent only could the adjudication go.

The principal opinion also relies upon the special census taken under the amendment of the classification act, which amendment was made in 1899. I have shown—at least to my own satisfaction—that this amendment does not apply to any city or town which could not effect a change of its organization from one class to another; and, further, that after the census has been taken the city does not enter the new class until the reorganization has been accomplished. It was held by Mr. Justice Henshaw that such was the case even under the classification act of 1883: In re Mitchell, 120 Cal. 384, 52 Pac. 799. Section 103 of the Code of Civil Procedure does not provide that cities having a population of 10,000 and not

more than 20,000 shall have a justice of the peace. If this special census was lawfully taken (which I deny) Berkeley did not become a city of the fourth class. Section 103, therefore, does not apply to it. Berkeley did not enter a new class in the mode provided.

It is said that when the first classification act was passed it was intended to include and apply to all municipalities. For one I concede this. There were then no freeholder charters, and but one city could have formed a charter under the constitution as first adopted; and the legislature could amend or change all municipal charters by general laws. It was held that such general laws were laws in regard to the organization of municipalities: City of Los Angeles v. Teed, 112 Cal. 319, 14 Pac. 580; City of Pasadena v. Stimson, 91 Cal. 249, 27 Pac. 604. Since then the constitution has been amended, and now general laws do not affect any cities or towns as to municipal affairs. There can be then no possible purpose for a classification under the constitution except as to cities and towns formed under the municipal incorporation act. The classification for this purpose does not make the reference to the classes for other purposes general laws. Such laws will be special unless justified for other reasons than the reference to such classes. This was elaborately shown by the chief justice in Dougherty v. Austin, 94 Cal. 601, 16 L. R. A. 161, 28 Pac. 834, 29 Pac. 1092. I perceive no effort in the principal opinion to answer the objection that section 103, as amended, is a special law, if it applies to the town of Berkeley. In that respect it is the precise case considered in Miner v. Justice's Court.

We concur: Henshaw, J.; Harrison, J.

"TEMPLE, J.—The petitioner is held in custody for a violation of an ordinance of the town of Berkeley upon a judgment before Robert Edgar, who claimed to be, and acted as, a justice of the peace of the town of Berkeley. The petitioner contends: (1) That under the laws and constitution of the state there is no justice court in the town of Berkeley, and therefore Edgar was not a justice of the peace; (2) the ordinance under which the conviction was had is void, because repugnant to general laws of the state, and also to the state and federal constitutions; and (3) the complaint upon

which he was prosecuted does not show that he has violated the ordinance.

"It was decided by this court in Miner v. Justice Court, 121 Cal. 264, 53 Pac. 795, that there was no justice court in the town of Berkeley. It was said that the effect of the freeholders' charter, adopted in 1895, was to abolish the provision for a justice court in the former special charter, and that the provision made in the freeholders' charter for a justice court was ineffectual. It was also held that an act passed in 1895, purporting to create a justice court in the town of Berkeley, was void, because it was special and local legislation. In 1899 the legislature passed two acts, which, it is contended, together had the effect of providing a justice court for the town of Berkeley. One was an act to amend the classification acts of 1883: Stats. 1899, p. 141. It authorized a special census of the inhabitants of any city or town, and provided that if, from such census, it should appear that the number of inhabitants would entitled the municipality 'to reorganize under a higher or lower class,' proceedings could be inaugurated to that end, and for the election of the officers required for the class to which it was changed, and that upon the qualification of such officers the corporation shall belong to such class. Then follow the provisions which throw doubt upon the purpose and effect of the amendment. They are: 'Whenever the result of such enumeration shall have been declared by the council, board of trustees or other governing body, and entered in the minutes of such body, thereupon the number of such inhabitants so ascertained shall be deemed the number of the inhabitants of such city for all the purposes of this act, and for the purposes of legislation affecting municipalities. The clerk of the council, board of trustees, or other governing body of such city, shall cause a certified copy of such minute order to be filed with the board of supervisors of the county wherein such city is situated.' Counsel differ radically as to the effect of these two sentences. The petitioner contends that the census does not of itself change the class of the city, but only serves the purpose of the act, which is to enable the city or town to reorganize, and enter another class. The respondent argues that, as soon as the census return is entered in the minutes, the city enters a new class, and is thenceforth in the class indicated by the census return. But the presumptions are all against this construc-

tion. The purposes of the classification required by the constitution are for the incorporation and organization of cities and towns only. In regard to laws not for such purposes the classification is not one made by the constitution, in regard to which legislation may be had without incurring the risk that such legislation may be special or local. No doubt the classes might be referred to in legislation as conveniently indicating the subjects of legislation; but when so referred to in statutes in regard to other matters than the incorporation and organization of cities and towns the legislation must be general, or the failure to include all must be justified by intrinsic differences: Rauer v. Williams, 118 Cal. 402, 50 Pac. 691. Whatever plausibility there was formerly in contending that the classification could apply to cities and towns other than those organized under the general municipal incorporation act, there is none since the constitutional amendments of 1896, which deny to the legislature the power to control the charters of cities and towns as to municipal affairs. Whatever meaning may ultimately be given to the phrase 'municipal affairs,' I have no doubt it will include all matters pertaining to the incorporation and organization of such cities and towns. It is not to be presumed that these cities and towns are to be classified whose organization cannot be controlled or affected by the legislature. Apparently now no such legislation is possible save as to cities and towns organized under the general incorporation act, and that must be by amending the general municipal incorporation act. The legislature could not have intended that the mere taking of the census should of itself raise the city to another class. The impracticability of this is shown in Rauer v. Williams, supra, and the proposition is amplified by Mr. Justice Henshaw in his concurring opinion: In re Mitchell, 120 Cal. 384, 52 Pac. 799. This proposition may be said to be the basis of that decision. In view of this construction we are not at liberty to suppose that it was intended that the town of Berkeley should, by merely entering the return of the enumeration, pass to another class of cities. Having a freeholders' charter, there would be nothing accomplished by such classification. The number of the inhabitants so ascertained may be deemed the number of the inhabitants for the purposes of legislation without changing the classification of the town—supposing it to be a town which could be included in the classification.

As we have seen, except for purposes of incorporation and organization, cities and towns may as well be referred to as containing a stated number of inhabitants as by referring to the classes.

"The other statute referred to, passed in 1899, consists in an amendment to section 103 of the Code of Civil Procedure. The former section, for the purpose of providing for justices of the peace in some cities, made a classification of cities having 10,000 and not more than 20,000 inhabitants, and cities having 20,000 inhabitants and not more than 100,000. The new section provides justices of the peace for cities of the second, third and fourth classes, but excepts from its operation cities and towns organized under the general municipal incorporation act. Berkeley is a city of the fifth class, and no justice of the peace is provided for cities of that class in section 103 as amended. It is contended that by virtue of the special census, and the return thereof, Berkeley became a city of the fourth class, for which class of cities a justice of the peace is provided in the amended section. Berkeley was not reorganized under the act so as thus to become a city of the fourth class, and, having a freeholders' charter, it cannot be. It has, therefore, not become a city of the fourth class, and under the decision in Miner v. Justice's Court, supra, it still has no city justice of the peace.

"It is further contended by the respondent that the city of Berkeley has a justice court by virtue of the constitution, irrespective of the legislative action or nonaction. This contention is based solely upon the proposition that section 1, article 6, declares that the judicial power of the state shall be vested in certain named courts, in which are included justices of the peace; and section 11 of the same article provides that the legislature shall determine the number of justices of the peace to be elected in townships, incorporated cities and towns, and shall fix by law their powers, duties and responsibilities. At the best this but declares that it is the duty of the legislature to provide such courts, but the constitutional provision cannot be self-operative. In the absence of legislation, the justices cannot be elected; and, if they could be elected, they would have no duties or powers.

"I conclude that there is no city justice of the peace for Berkeley, and that the petitioner is illegally held."